**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COUNTY OF MONMOUTH and DIANE SCAVELLO,** *Individually and on Behalf of All Others Similarly Situated*, | |
| *Plaintiffs*, | **Civil Action** |
| *v.* | **No. 20-cv-2024** |
| **RITE AID CORPORATION,** *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION

**Goldberg, J.**                                                                        March 31, 2023

The County of Monmouth, New Jersey ("Monmouth") and Diane Scavello have brought a putative class action for fraud and related claims alleging that Defendant Rite Aid Corporation and associated entities (collectively "Rite Aid") made false representations when submitting insurance claims for prescription drugs. Monmouth sponsors a health plan that covered drug purchases from Rite Aid pharmacies. Scavello is a Rite Aid customer who maintains health insurance but is not insured by Monmouth.[1]

Rite Aid has moved to compel Scavello to arbitrate her claims. Rite Aid does not allege that Scavello signed an agreement to arbitrate. Instead, Rite Aid seeks to hold Scavello to an arbitration provision in a contract solely between Rite Aid and OptumRx, Inc. ("Optum"), a pharmacy benefits

---

[1] Both Monmouth and Scavello seek to represent classes of similarly situated plan sponsors and Rite Aid customers.

manager (PBM). The Optum–Rite Aid contract, which does not mention Scavello, establishes Rite Aid as a member of Optum's pharmacy network.

Rite Aid acknowledges that a party is usually not bound by a contract they never assented to, but nonetheless argues that Scavello is bound by the Optum–Rite Aid contract under the doctrine of "equitable estoppel," which sometimes requires a non-signatory to arbitrate when they have "reaped the benefits of a contract containing an arbitration clause." Griswold v. Coventry First LLC, 762 F.3d 264, 272 (3d Cir. 2014). According to Rite Aid, Scavello reaped such benefits because she bought prescription drugs at reduced prices, such that she must now adhere to the Optum–Rite Aid contract's terms.

For the reasons explained below, I find that equitable estoppel does not bind Scavello to the Optum–Rite Aid contract and will therefore deny Rite Aid's motion to compel arbitration.

## I. FACTS

### A. Scavello's Claims

Rite Aid's equitable estoppel argument hinges on the nature of Scavello's claims against Rite Aid and the relation of those claims to the Optum–Rite Aid contract. See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 202 (3d Cir. 2001) (considering "the thrust of the [plaintiff's] claims" in relation to the arbitration agreement). I therefore summarize what Scavello alleges Rite Aid did wrong and how Scavello claims she was harmed by it.

### (1) Alleged Misrepresentations

Rite Aid is a pharmacy that sells prescription drugs. When an insured customer makes a purchase, Rite Aid transmits information about the purchase to the customer's insurer or the

insurer's agent.  The insurer (or its agent) will then send a message back "indicating whether the drug and consumer are covered and, if so, the amount the pharmacy must collect from the consumer as a copayment, coinsurance, or deductible amount." (Amended Complaint ¶¶ 6-7, 11, 36.)

According to Scavello, Rite Aid uses an industry standard form to transmit information to customers' insurers.  One of the fields in that standard form contains the pharmacy's (in this case Rite Aid's) "usual and customary" price for the drug being sold.  Scavello alleges that "usual and customary" is widely understood in the industry to mean "the cash price charged to the general public, exclusive of sales tax or other amounts claimed." Scavello cites various sources for this alleged understanding. (Amended Complaint ¶¶ 35-36, 39-47.)

The gist of Scavello's fraud and other misrepresentation claims is that Rite Aid submitted "usual and customary" prices to insurers that were not actually the prices Rite Aid would charge the general public for the same drugs. According to Scavello's allegations, Rite Aid offered uninsured customers discounts on prescription drugs.  Thus, Scavello asserts, those discounted prices—not the listed retail prices—were Rite Aid's "usual and customary" prices for the drugs it sold.  But when submitting information to a customer's insurer, Rite Aid allegedly reported a price that was much higher than the discounted price a cash-paying customer would pay.  Scavello alleges that this report, submitted to the insurer, was false.  And, because Rite Aid was aware that the prices it reported were not accurate, Scavello asserts that these misrepresentations were made fraudulently. (Amended Complaint ¶¶ 48-51, 54-55, 60, 123-26.)

### (2)  Alleged Harm to Scavello

Scavello maintains health insurance but does not allege that Rite Aid offered false "usual and customary" prices to her personally.  Instead, she alleges that Rite Aid's false reports to insurers

harmed her because they caused her to pay higher copayments than she would have otherwise. According to Scavello, her copayment was "calculated based on the [usual and customary] price reported by Rite Aid." Thus, she alleges that "Rite Aid knowingly based ... [her] payment on a purported [usual and customary] price that was fraudulently inflated above Rite Aid's true [usual and customary] price," causing her to be charged a copayment that was "also artificially inflated." (Amended Complaint ¶¶ 2, 20, 38, 60, 308.)

Scavello further alleges that she was unaware that "the copayment demanded and charged was not accurate." Thus, she claims that "Rite Aid ... made price representations to [her] ... at the point of sale" and that these were "false." And Scavello asserts that out-of-pocket charges (such as copayments) "cannot" exceed the usual and customary price for a drug but that she was charged copayments that did exceed Rite Aid's true usual and customary prices for the drugs she purchased. (Amended Complaint ¶¶ 20, 38, 67, 310.)

Based on these allegations, Scavello brings claims for fraud, negligent misrepresentation, violation of Pennsylvania's Unfair Competition and Consumer Protection Law, and unjust enrichment.

**B. The Optum–Rite Aid Contract**

Rite Aid introduces the following additional facts that are not contained in the complaint. For purposes of this motion, Scavello does not dispute these facts[2]:

Scavello was insured under a Blue Cross Medicare Part D health plan when she made

---

[2] Although the facts pertaining to the Optum–Rite Aid contract are outside the pleadings, Scavello does not object to their consideration. See Guidotti v. Legal Helpers Debt Resol., LLC, 716 F.3d 774-76 (3d Cir. 2013) (motion to compel arbitration may consider facts outside the pleadings under a summary judgment standard); Fed. R. Civ. P. 56(a) (summary judgment is proper when "there is no genuine dispute as to any material fact").

the purchases at issue in this case. (Rite Aid's Memorandum at 6-7.) Blue Cross does not transact

with Rite Aid directly but operates through an intermediary known as a pharmacy benefits manager

(PBM), in this case Optum. Rite Aid attaches a substantially redacted copy of a contract between

Optum and Rite Aid to its motion to compel arbitration (the "Optum–Rite Aid contract").[3]

The Optum–Rite Aid contract incorporates a document that required Optum and Rite Aid

to arbitrate their disputes. Specifically, the contract incorporates the terms of Optum's "provider

manuals," and a document that Rite Aid represents to be Optum's 2017 Provider Manual includes

a provision stating, in relevant part:

> Other than with respect to issues giving rise to immediate termination hereof
> or non-renewal hereof, the parties will work in good faith as set forth below to
> resolve any and all issues and/or disputes between them (hereinafter referred to
> as a "Dispute") including, but not limited to all questions of arbitrarily [sic], the
> existence, validity, scope, interpretation or termination of the Agreement, PM
> [presumably Provider Manual] or any term thereof prior to the inception of any
> litigation or arbitration.
> …
> If the party asserting the Dispute has satisfied the requirements of this section
> thereof, it shall thereafter be submitted to binding arbitration . . . .

(Farrell Dec. Ex. E at 123.)

Rite Aid contends that Scavello is bound by this provision and must accordingly arbitrate

her claims in this case.

---

[3] Technically, only Defendant Rite Aid Hdqtrs. Corp. is a party to the Optum–Rite Aid contract,
but Scavello does not dispute that all Rite Aid Defendants may cite it. See Richards v. Am. Aca-
demic Health Sys., LLC, No. 20-cv-59, 2020 WL 2615688, at *4 (E.D. Pa. May 22, 2020) (per-
mitting non-signatory defendant to invoke arbitration agreement).

## II.  LEGAL STANDARD

"Because arbitration is a matter of contract between the parties, a judicial mandate to arbitrate must be predicated upon the parties' consent." Guidotti, 716 F.3d at 771 (alterations and quotation marks omitted).  Before compelling arbitration, a court must be "satisfied that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4.

A party moving to compel arbitration may rely on facts outside the pleadings. See Guidotti, 716 F.3d at 774-76.  In such a case, the court must apply a summary judgment standard to determine whether the undisputed facts establish the existence of a valid agreement to arbitrate. See id. If the outcome turns on disputed facts, the parties have a right to present that issue to a jury.  9 U.S.C. § 4.

In this case, the parties do not dispute any facts relevant to the existence of an agreement to arbitrate.  In particular, Scavello does not dispute the existence of the Optum–Rite Aid contract or its incorporation of the Optum Provider Manual's arbitration provision, nor does she challenge Rite Aid's assertion that her fraud claims involve price submissions that Rite Aid made to Optum pursuant to that contract.  I therefore consider whether these undisputed facts require arbitration of Scavello's claims.

## III.  DISCUSSION

"The Federal Arbitration Act, 9 U.S.C. § 1 et seq. ('FAA'), creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." Invista S.A.R.L. v. Rhodia, S.A., 625 F.3d 75, 83 (3d Cir. 2010).  "In particular, the FAA provides that as a matter of federal law '[a] written provision' in a maritime or commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon

such grounds as exist in law or equity for the revocation of any contract.' " Id. (quoting 9 U.S.C. § 2).

"Arbitration is strictly a matter of contract.  If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." Bel-Ray Co. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999); see also Morgan v. Sundance, Inc., 142 S. Ct. 1708, 1713 (2022) ("[A]rbitration agreements [are] as enforceable as other contracts, but not more so.").  Neverthe-less, "non-signatories may be bound to arbitration agreements under certain very limited circum-stances." Invista, 625 F.3d at 84.  "In determining if parties have agreed to arbitrate, [courts] apply ordinary state-law principles that govern the formation of contracts." Id. (quotation marks omitted).  Thus, "if traditional principles of state law allow a contract to be enforced . . . against nonparties to the contract," the non-signatory may be compelled to arbitrate.  Griswold, 762 F.3d at 271 (quota-tion marks omitted).

Rite Aid seeks to bind Scavello to the Optum–Rite Aid contract under the doctrine of "equi-table estoppel," which "prevent[s] a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." DuPont, 269 F.3d at 199-200.  "A nonsignatory can 'embrace' a contract in two ways: (1) by knowingly seeking and obtaining direct benefits from that contract; or (2) by seeking to enforce terms of that contract or asserting claims based on the contract's other provisions." Griswold, 762 F.3d at 272 (alterations omitted).  Rite Aid argues that Scavello "embraced" the Optum–Rite Aid contract in both of these ways, which I consider below.

### A.  Seeking to Enforce

According to Rite Aid, Scavello is bound by the Optum–Rite Aid contract because the claims in her complaint, although styled as tort claims, actually seek to enforce Rite Aid's <u>contractual</u> obligation to report "usual and customary" prices to Optum.

While Rite Aid acknowledges that Scavello does not literally allege breach of a contractual duty to report usual and customary prices, Rite Aid posits that the only reason Scavello was entitled to have Rite Aid submit any prices at all was that Scavello was insured under a health plan that utilized Optum's pharmacy network. Rite Aid points to the Optum–Rite Aid contract's definition of "usual and customary" prices and argues that it controls Rite Aid's price-reporting obligations irrespective of how that term might have been defined by others in the industry. (Farrell Dec. ¶ 26; Farrell Dec. Ex. E at 108, Farrell Dec. Ex. B at 17.) Thus, in Rite Aid's view, Scavello's claim that Rite Aid submitted the wrong prices is tantamount to alleging that Rite Aid failed to perform under the Optum–Rite Aid contract.

Rite Aid also contends that even though Scavello has pled tort claims, there were no actual tort duties governing Rite Aid's conduct. In particular, Rite Aid notes that PBM–pharmacy contracts frequently vary the precise definition of "usual and customary" prices, such that the "industry standard" definition Scavello alleges in inapplicable. Thus, Rite Aid argues that I should treat Scavello's complaint as alleging a duty created by contract because no other duty existed.

In addressing Rite Aid's arguments, I begin by examining the precise duties Scavello alleges Rite Aid breached and how Scavello claims to have been harmed. <u>See</u> <u>DuPont</u>, 269 F.3d at 202. Scavello alleges that Rite Aid harmed her in two ways: First, Rite Aid allegedly lied to Scavello's insurer or its agent—who, for purposes of this motion, is understood to be Optum—and thereby caused Optum to charge Scavello too high a copayment. Second, Scavello alleges that Rite

Aid lied <u>to her</u> personally about the nature of the copayment it collected, leading her to believe the copayment was based on the drug's cash price when in fact it was not.

Neither alleged harm depends on Rite Aid having a contractual duty to report usual and customary prices to Optum.  Regardless of why Rite Aid reported prices, Scavello alleges Rite Aid breached a tort duty to not knowingly misrepresent facts to induce others to rely on them. (Amended Complaint ¶¶ 121-130.)  As the Ninth Circuit explained in rejecting a nearly identical argument by Rite Aid:

> It is irrelevant whether the contracts between Rite Aid and the pharmacy ben-
> efits managers required Rite Aid to report the usual and customary price of a
> prescription drug.  Even if the contracts contained no provision requiring Rite
> Aid to report the usual and customary price, the fact remains that Rite Aid <u>did</u>
> report that information and allegedly purposely inflated it. Rite Aid's duty not to
> commit fraud is independent from any contractual requirements with the phar-
> macy benefit managers.

<u>Stafford v. Rite Aid Corp.</u>, 998 F.3d 862, 866 (9th Cir. 2021).

To make the point more concrete, suppose that Rite Aid transmitted a message to Optum that said, in effect, "Scavello is seeking to purchase XYZ. As agreed in our contract, we are report-ing the $20.00 price of the drug.  Incidentally, $20.00 is also what a cash-paying customer would pay." Scavello's fraud claim is not that Rite Aid was contractually obligated to report a different price but that Rite Aid should not have falsely represented whatever price it reported, required or not, to be the cash price.  (<u>See</u> Amended Complaint ¶¶ 60, 123.)  Thus, Scavello does not seek to hold Rite Aid to its obligations to Optum, and she is not "seeking to enforce terms of that contract or asserting claims based on the contract's other provisions." <u>Griswold</u>, 762 F.3d at 272 (alterations omitted).

The Third Circuit's decision in <u>DuPont</u> supports the above reasoning.  There, the plaintiff brought a claim for alleged breach of an oral promise to continue performing under a written

contract, which contained an arbitration provision. 269 F.3d at 201. Although performing under the oral promise would have meant performing under the written contract and therefore "implicate[d]" the written contract, the duty allegedly breached was only the oral promise. Id. For that reason, the plaintiff was not required to arbitrate. Id. The same is true here: Scavello alleges only a breach of the duty not to commit fraud and therefore does not seek to enforce the Optum–Rite Aid contract.

Rite Aid's primary response is that there was no actual tort duty requiring it to report accurate usual and customary prices to Optum (or, if there was such a duty, the contract displaced it). Thus, Rite Aid reasons, Scavello's claims must rest on contractual duties even if that is not how Scavello pled them. In effect, Rite Aid argues that because Scavello's claims are meritless, I should analyze not Scavello's actual claims but the contract claims Scavello should have brought.

Rite Aid's position is inconsistent with the rule that "the plaintiff, not the defendant, controls the complaint," a principle the Third Circuit has repeatedly applied to the arbitration context. Abdurahman v. Prospect CCMC LLC, 42 F.4th 156, 162 (3d Cir. 2022). For example, the DuPont court recognized that it was "bound to accept as true" the plaintiff's alleged breach of duty "for purposes of reviewing and resolving the arbitration issue." Dupont, 269 F.3d at 204-05. The conclusion of Abdurahman is similar: There, the defendant sought to compel arbitration based on an agreement between the plaintiff and a non-party that the plaintiff "could have," but did not, sue. The Third Circuit declined to "pierce the pleadings and determine, somehow, whether other parties and grounds might have been added and whether their absence is tied, in some way, to an intent to avoid arbitration." 42 F.4th at 162.

This rule that the plaintiff's actual, not hypothetical, claims control the estoppel analysis is illustrated again in O'Hanlon v. Uber Techs., Inc., 990 F.3d 757 (3d Cir. 2021). In that case, users of motorized wheelchairs sued Uber for not offering accessible transportation. Uber moved

to compel arbitration, "contending that even though Plaintiffs had never registered for an Uber account or accepted its Terms of Use, they were nevertheless bound by the mandatory arbitration clause of that agreement" because "Plaintiffs could not establish standing to sue in federal court unless they 'step into the shoes' of 'actual Uber Rider App users who all are bound by Uber's Terms of Use.' " Id. at 761. The Third Circuit declined the invitation to recharacterize the plaintiffs' claims: the plaintiffs' complaint did not mention Uber's Terms of Use, and their claims accordingly "ar[ose] entirely under the [Americans with Disabilities Act]." Id. at 767. Whether the plaintiffs had standing to bring that claim was a separate issue the Third Circuit determined it did not have to reach. Id. at 765-66.

The consistent reasoning of these cases is clear: When a plaintiff chooses not to bring claims that would implicate an arbitration agreement, a court may not substitute different claims in an effort to "pull[] the entire dispute into … arbitration … ." Abdurahman, 42 F.4th at 161. Here, as in Abdurahman, O'Hanlon, and DuPont, Scavello bases her claims on alleged obligations that are independent of the contract containing an arbitration agreement. If there are deficiencies in Scavello's tort claims (an issue I do not reach), that is for the merits; it does not mean that Scavello is really bringing a contract claim.

Rite Aid cites to precedent which it posits shows that courts have relied on deficiencies in alleged tort duties to bind a plaintiff to arbitration. But the cases Rite Aid cites do not support its position. Rite Aid first cites a district court's decision that a plaintiff could not maintain a parallel, non-arbitrable claim for breach of an oral promise because the written arbitration agreement contained an integration clause, thus triggering the parol evidence rule. Hutt v. Xpressbet, LLC, No. 20-cv-494, 2020 WL 2793920, at *6 (E.D. Pa. May 29, 2020). But the court in that case did not invent an arbitrable claim the plaintiff did not bring, as the plaintiff himself sought to

enforce a confidentiality provision of the written contract. Id. The other case Rite Aid relies on, Esis, Inc. v. Coventry Health Care Workers Comp., Inc., No. 13-cv-2957, 2016 WL 928667 (E.D. Pa. Mar. 9, 2016), held that the plaintiff's tort claims were insufficiently pled in part because the plaintiff "identifie[d] no independent duty of care" aside from the contract. Id. at *6. But Esis did not issue an order compelling arbitration nor, as Rite Aid urges here, did it craft an arbitrable claim the plaintiff did not bring. Rather, the outcome in Esis was that the claims either had to be dismissed because the plaintiff was a party to the arbitration agreement and thus agreed to arbitrate all claims "concerning" it, or, alternatively, that the claims were insufficiently pled and had to be dismissed under Rule 12(b)(6). Id. at *5-*6.

Rite Aid's other cases are even farther afield. In Scottsdale Ins. Co. v. Kinsale Ins. Co., 253 F. Supp. 3d 796 (E.D. Pa. 2017), an insurer asserted the rights of its insured as a subrogee, so it stepped into the shoes of the insured and was accordingly bound by the insured's agreement to arbitrate. Id. at 803. In Just B Method, LLC v. BSCPR, LP, No. 14-cv-1516, 2014 WL 5285634 (E.D. Pa. Oct. 14, 2014), the non-signatory plaintiff was suing for breach of an obligation to provide commissions to the signatory LLC of which the plaintiff was the sole member. Id. at *8-9. And in Crawford Pro. Drugs, Inc. v. CVS Caremark Corp., 748 F.3d 249 (5th Cir. 2014), the plaintiff was a signatory, so that case has no application to these facts. Id. at *225. In short, as far as the parties' briefing reveals, a court has never concluded that claims analogous to Scavello's "s[ought] to enforce" an unpled contract to which the plaintiff was not a party.

Alternatively, Rite Aid seeks to reason by analogy to Pennsylvania's "gist of the action doctrine," which "prevents a purely contractual duty from serving as the basis for a tort claim." SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 216 (3d Cir. 2022). To the extent this analogy is informative, I conclude that it points against arbitration of Scavello's claims. Whether a tort

claim is barred under the gist of the action doctrine turns on "the nature of the duty alleged to have been breached." Id. at 217. "Tort actions arise from the breach of a duty owed to another as a matter of social policy, while breach-of-contract actions arise from the breach of a duty created by contract." Id. at 216. Here, Scavello alleges breach of a societal duty not to defraud, and "a precontractual duty not to deceive through misrepresentation or concealment exists independently of a later-created contract." Id. at 217. In addition, a contract that "merely serve[s] as the vehicle which established the relationship between" two parties does not trigger the gist of the action doctrine with respect to any torts that are committed during the course of that relationship. Bruno v. Erie Ins. Co., 106 A.3d 48, 70 (Pa. 2014). Similarly, in the arbitration context, an arbitration agreement that merely brings non-signatories together does not obligate those non-signatories to arbitrate their disputes. Abdurahman, 42 F.4th at 162.

Accordingly, Scavello is not bound by the arbitration provision in the Optum–Rite Aid contract as a non-signatory "seeking to enforce terms of that contract or asserting claims based on the contract's other provisions." Griswold, 762 F.3d at 272 (alterations omitted).

### B. Accepted Benefits From

Rite Aid's next theory is that Scavello is bound by the Optum–Rite Aid contract because she "knowingly s[ought] and obtain[ed] direct benefits from that contract." Griswold, 762 F.3d at 272. According to Rite Aid, Scavello obtained or seeks to obtain two benefits from the Optum–Rite Aid contract: First, Scavello allegedly benefited when she shopped at Rite Aid stores and obtained reduced prices based on Rite Aid's participation in Optum's pharmacy network.[4] Second, Rite Aid

---

[4] This point is arguably disputed because Scavello alleges that Rite Aid's insured customers pay more than uninsured customers for the same drugs. (Amended Complaint ¶ 3.) Nevertheless, I find it unnecessary to resolve this factual dispute because, even assuming Scavello benefited from Rite

asserts that Scavello seeks to benefit again from that contract by claiming damages based on Rite Aid's alleged failure to send the proper pricing information to Optum.

I begin with Rite Aid's argument that Scavello is bound by the Optum–Rite Aid contract because she received benefits from that contract in the <u>past</u>—by shopping at Rite Aid pharmacies. Cases in which courts have compelled arbitration under a "direct benefits" theory all involved a significantly closer nexus among the contract, the benefits, and the claims than is present here. A representative example is <u>American Bureau of Shipping v. Tencara Shipyard S.P.A.</u>, 170 F.3d 349 (2d Cir. 1999). There, owners of a vessel hired an intermediary to obtain a "classification" (a type of certificate) for the vessel that the owners could present to an insurance carrier. <u>Id.</u> at 351. When the certificate was obtained and presented to the owners, it "incorporated by reference" an arbitration agreement between the intermediary and the issuer of the certificate. <u>Id.</u> The owners then used the certificate to insure the vessel, and, based on that conduct, the Second Circuit held that the owners were bound to arbitrate whatever claims they had against the issuer. <u>Id.</u> at 351-53. Thus, the bound non-signatory in <u>American Bureau of Shipping</u> knowingly presented a document incorporating an arbitration agreement to an insurer and obtained "direct benefits" in the form of the insurance policy. <u>Id.</u> at 353.

Scavello's situation is quite different. Scavello is not alleged to have seen the Optum–Rite Aid contract nor to have presented it to anyone. Nor is Scavello alleged to have received or used a document that incorporated the Optum–Rite Aid contract by reference.  Whatever incidental benefit Scavello may have received from the Optum–Rite Aid contract, it was not a benefit that she "s[ought] and obtain[ed]." <u>Griswold</u>, 762 F.3d at 272.  Given that "arbitration agreements [are] as

_____

Aid's membership in Optum's pharmacy network, she is not required to arbitrate her claims.

enforceable as other contracts, but not more so," Morgan, 142 S. Ct. at 1713, the consequence of Rite Aid's position would seem to be that Scavello is bound to the entire Optum–Rite Aid contract, even though she never saw it and did not know it existed, just because she shopped at Rite Aid stores—an extraordinary result.

The present case is more analogous to Bouriez v. Carnegie Mellon University, 359 F.3d 292 (3d Cir. 2004), where the plaintiff sued a university for fraudulently inducing him to invest in a corporation that was sponsoring the university's research. Id. 293-94. The corporation had signed an arbitration agreement with the university, and the university argued that the plaintiff was bound by it because he benefited from their agreement. Id. 294. But the Third Circuit found that whatever benefit the plaintiff might have received as a shareholder of a contracting party was insufficient to bind him to the arbitration agreement. Id. at 295. Here, as in Bouriez, Scavello received at most downstream benefits from the Optum–Rite Aid contract as an insured of one of Optum's clients. This sort of "indirect" benefit does not trigger equitable estoppel. DuPont, 269 F.3d at 200.

Rite Aid's other cited cases are even less on point. In HealthplanCRM, LLC v. AvMed, Inc., 458 F. Supp. 3d 308 (E.D. Pa. 2020), the bound non-signatory used the signatory's software and accepted a "browserwrap" agreement incorporating the software's license, which contained the arbitration agreement—an express endorsement of the arbitration agreement not alleged here. Id. at 331-34. Next, in Amkor Tech., Inc. v. Alcatel Bus. Sys., 278 F. Supp. 2d 519 (E.D. Pa. 2003), the plaintiff was a downstream purchaser suing for defects in chips provided pursuant to a contract with the upstream purchaser. Id. at 532. The downstream purchaser had to abide by the arbitration agreement in the upstream contract. Id. Thus, in Amkor, the claim in effect challenged the upstream vendor's performance under the contract, again unlike Scavello's claims in this case.

Finally, in Fencourt Reinsurance Co. v. ITT Indus., Inc., No. 06-cv-4786, 2008 WL

2502139 (E.D. Pa. June 20, 2008), arbitration was compelled only as to an issue directly based on the contract containing the agreement to arbitrate—whether the defendant had assumed its alleged predecessor's liability—and the court did not reach whether the underlying claim for breach of a promise outside the contract would be arbitrable. See id. at *11 ("[T]he Court will stay the case pending the resolution of the arbitration proceedings between [the plaintiff] and [the defendant] . . . ."); id. at *4 ("[The defendant] . . . take[s] the position that the first [issue] should be arbitrated, but the second litigated."). Thus, the only issue on which Fencourt actually compelled arbitration was whether the very contract containing the arbitration clause gave the plaintiff a right to pursue the alleged successor for its predecessor's promise. Id. at *10. In sum, none of these cases are analogous to a customer shopping at a pharmacy and receiving the benefit of in-network prices.

More fundamentally, Rite Aid offers no equitable justification for rewriting the contractual arrangement among Rite Aid, Optum, Blue Cross, and Scavello to be something other than what these parties agreed to. Cf. Abduraham, 42 F.4th at 162 (declining to "rewrit[e] the law" to compel arbitration where a party had not contracted for it). Scavello's interaction with Rite Aid was no surprise: the Optum–Rite Aid contract contemplated the involvement of plan members like Scavello, but left them out of its arbitration provision. (See Farrell Dec. Ex. B at 14 ("[Rite Aid] seeks to provide Covered Prescription Services to Members of [Optum's] Clients using its Pharmacies in accordance with the terms and conditions of this Agreement.").) In fact, Optum and Rite Aid crafted a process for dispute resolution involving "President[s]" and "Vice President[s]," clearly anticipating that no customer was meant to invoke it. (See Farrell Dec. Ex. E at 123.) If Optum and Rite Aid wanted plan members like Scavello to arbitrate disputes with pharmacies, they "could have drafted a contract [with plan members] directing [their] disputes to arbitration." Abdurahman,

42 F.4th at 162. But they did not, and their contractual choice to "distin[guish] between signatories and non-signatories" must be respected. See DuPont, 269 F.3d at 202.

Finally, Rite Aid's contention that Scavello seeks to benefit from the Optum–Rite Aid contract in the future—by claiming damages in this case—just recasts its position that Scavello's claims are based on the contract. For the reasons explained previously, Scavello's claims do not seek to benefit from the Optum–Rite Aid contract because she only alleges harm from breaches of duties independent of the contract. Scavello is therefore not equitably estopped under a "direct benefits" theory.

## IV. CONCLUSION

For the reasons set out above, Rite Aid's motion to compel arbitration will be denied.

An appropriate order follows.