IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COUNTY OF MONMOUTH and DIANE SCAVELLO,** *Individually and on Behalf of All Others Similarly Situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> **RITE AID CORPORATION,** *et al.*, <br><br> *Defendants*. | Civil Action <br><br> No. 20-cv-2024 |

MEMORANDUM OPINION

**Goldberg, J.**                                                                                    March 31, 2023

The County of Monmouth, New Jersey ("Monmouth") and Diane Scavello have brought a putative class action for fraud and related claims alleging that Defendant Rite Aid Corporation and associated entities (collectively "Rite Aid") made false representations when submitting insurance claims for prescription drugs. Monmouth sponsors a health plan that allegedly covered drug purchases from Rite Aid pharmacies, and Scavello is a Rite Aid customer who is insured, but not by Monmouth.

Rite Aid has moved to dismiss Monmouth's claims only. In a separate motion, Rite Aid has also moved to compel Scavello to arbitrate her claims. This opinion addresses only the motion to dismiss.

Rite Aid's principal argument for dismissal is that Monmouth's factual allegations are contradicted by the terms of two contracts between Monmouth and non-party Express Scripts, Inc.,

1

who Rite Aid claims acted as an intermediary between Monmouth and Rite Aid. Although the Monmouth–Express Scripts contracts are not attached to or referenced anywhere in Monmouth's complaint, Rite Aid argues that they are judicially noticeable either because the complaint implicitly relies on them or because Monmouth is a public entity and its contracts are publicly available. Monmouth opposes consideration of the Monmouth–Express Scripts contracts at this stage of the proceedings.

For the reasons explained below, I find that even assuming the existence of the Monmouth–Express Scripts contracts is judicially noticeable, the factual inferences Rite Aid seeks to draw from them are not. I further conclude that Rite Aid's remaining arguments for dismissal also implicate factual issues that cannot be resolved at this stage of the litigation. I will therefore deny Rite Aid's motion to dismiss.

## I.  FACTS TAKEN FROM THE COMPLAINT

### A.  Alleged Misrepresentations

Rite Aid is a pharmacy that sells prescription drugs. When an insured customer makes a purchase, Rite Aid transmits information about the purchase to the customer's insurer or the insurer's agent. The insurer (or its agent) will then send a message back "indicating whether the drug and consumer are covered and, if so, the amount the pharmacy must collect from the consumer as a copayment, coinsurance, or deductible amount." (Amended Complaint ¶¶ 6-7, 11, 36.)

According to Monmouth, Rite Aid uses an industry-wide standard form to transmit information to customers' insurers. One of the fields in that standard form contains the pharmacy's (in this case Rite Aid's) "usual and customary" price for the drug being sold. Monmouth alleges that "usual and customary" is widely understood in the industry to mean "the cash price charged to the

general public, exclusive of sales tax or other amounts claimed." (Amended Complaint ¶¶ 35-36, 39-40.)

The gist of Monmouth's fraud and other misrepresentation claims is that Rite Aid submitted "usual and customary" prices to insurers that were not actually the prices Rite Aid would charge the general public for the same drugs. According to Monmouth, Rite Aid offered uninsured customers discounts on prescription drugs, available to all cash-paying (i.e. uninsured) customers. (Amended Complaint ¶¶ 48-51, 54.) Monmouth refers to the category of drugs for which Rite Aid offered discounts as "RSP Drugs" (referring to Rite Aid's "Rx Savings Program"). Monmouth asserts that the RSP Drugs' discounted prices—not their listed prices—were Rite Aid's "usual and customary" prices for those drugs. But when submitting information to a customer's insurer, Rite Aid allegedly reported a price that was much higher than the discounted price a cash-paying customer would pay. According to Monmouth, this report was false, and, because Rite Aid was aware that the prices it reported were not accurate, Monmouth alleges that these misrepresentations were made fraudulently. (Id. ¶¶ 55, 60, 123-26.)

### B. Monmouth County's Health Plan

"Monmouth … operates a self-funded health insurance plan and workers' compensation plan for its employees and retirees … ." This plan covers a share of the cost of its insureds' prescription drugs, and some of those insureds purchased RSP Drugs from Rite Aid—that is, drugs for which Rite Aid would offer cash discounts to uninsured customers. Monmouth alleges that Rite Aid misrepresented the usual and customary prices of these drugs. (Amended Complaint ¶¶ 17-18, 123, 125.) Monmouth further alleges that Rite Aid submitted claims for these purchases "to … Monmouth," that Rite Aid "charged" Monmouth for these drugs, and that Rite Aid "made such

misrepresentations . . . to Plaintiffs," thus including Monmouth, (Id. ¶ 38, 78, 106, 125, 135, 309.)[1]

Monmouth's complaint lists fifteen examples of purchases of RSP Drugs by Monmouth's insureds. For each purchase, Monmouth reports the price it paid for the drug alongside Rite Aid's cash discount price for that drug. Monmouth characterizes the difference between these two prices as an "overpayment." (Amended Complaint ¶ 61.)

According to Monmouth's complaint, "[t]he facts that Rite Aid misrepresented . . . were material to the decisions of . . . Monmouth . . . about whether to pay for Rite Aid's RSP Drugs . . . ." (Amended Complaint ¶ 312.) Specifically, "[h]ad Plaintiffs"—presumably including Monmouth—"known Rite Aid was reporting to and charging them inflated and false amounts, they would not have proceeded with the transactions." (Id. ¶ 124.) Thus, Monmouth alleges, it "paid more for RSP Drugs than it would have absent Rite Aid's misconduct." (Id. ¶ 18.)

## II. FACTS NOT IN THE COMPLAINT

In support of its motion to dismiss, Rite Aid asks me to take judicial notice of five documents (Rite Aid's Exhibits A through E). None of these documents nor the facts that follow are referenced in Monmouth's complaint.

I initially note that Monmouth does not object to judicial notice of Rite Aid's Exhibits A, B, and C. Exhibit A purports to be a news posting on Monmouth's website informing employees that "Monmouth County's prescription drug plan is administered by Express Scripts." Exhibits B and C purport to be resolutions by Monmouth's Board of Chosen Freeholders (the term for the

---

[1] In a footnote, Monmouth adds that an insurer "may utilize the services of a pharmacy benefit manager ('PBM')" and that a PBM "serve[s] as an intermediary between third-party payors and the rest of the healthcare industry." (Amended Complaint ¶ 36.) Monmouth does not allege whether it utilized the services of a PBM with respect to the claims at issue in this case nor what effect the involvement of a PBM would have on the submission of prices to Monmouth.

governing body of New Jersey counties) authorizing Monmouth to contract with Express Scripts to provide "pharmacy benefit management services," with the first contract covering January 1, 2015 through December 31, 2017, and the second January 1, 2018 through December 31, 2020.

Monmouth does object to the Court taking judicial notice of Rite Aid's Exhibits D and E, which Rite Aid certifies it obtained through a request under New Jersey's Open Public Records Act. These exhibits purport to be contracts between Monmouth and Express Scripts for the provision of pharmacy benefit management services. The contracts state that Express Scripts will be the "exclusive" provider of pharmacy benefit management services for Monmouth. (See Ex. D, "Recitals," ¶ C; Ex. E, Preamble.)

Rite Aid points to specific provisions of the Monmouth–Express Scripts contracts that it contends are relevant to the plausibility of Monmouth's claims in this case. First, both contracts provide for Express Scripts to establish a "network" of "participating" pharmacies. Monmouth, in turn, was to pay Express Scripts in amounts described as "reimbursement amounts" and "other administrative fees." (Ex. D §§ 2.2(a), 3.1; Ex. E §§ 2.2, 3.1.) Although neither of the Monmouth–Express Scripts contracts mentions Rite Aid, Rite Aid asserts, without a supporting citation, that it was one of Express Scripts' "participating pharmacies." (Rite Aid's Brief at 4 n.3.)

The 2018 contract specifically (Rite Aid's Exhibit E) provides that under certain circumstances, Monmouth would be charged according to a formula:

> If no adjudication rates are specified herein, each claim will be adjudicated to [Monmouth] at the applicable ingredient cost, and will be reconciled to the applicable guarantee as set forth herein. The discounted ingredient cost will be the lesser of [maximum allowable cost] (as applicable), [usual and customary] or the applicable [average wholesale price] discount.

(Ex. E, attachment A-2 ("Claims Reimbursement Rates"), § 5.6.) Rite Aid asserts that this formula did not depend on the amount billed by the pharmacy, but does not explain how the quoted language

produces that result. Importantly, the truth of Rite Aid's assertion is not readily apparent on the face of this document.

Next, Rite Aid notes that the Monmouth–Express Scripts contracts defined "usual and customary" prices as "the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to [Express Scripts] by the Participating Pharmacy." (Ex. D, Article I.) Rite Aid appears to interpret this definition as meaning that the pharmacy's reported price would be deemed "usual and customary" even if it were not actually the price "charged . . . in a cash transaction," although Rite Aid does not cite authority for this interpretation.

Finally, Rite Aid points to a section of the 2015 contract (Rite Aid's Exhibit D) titled "Annual Average Ingredient Cost Discount Guarantees" to argue that "the [usual and customary] price has no impact on the actual amount Monmouth paid [Express Scripts] for customers' prescription drug purchases from Rite Aid pharmacies." (Ex. D, attachment A-1, § I; Monmouth's Brief at 5.) The cited section describes a complicated formula that relates amounts Monmouth is obligated to pay Express Scripts to variables such as ingredient costs, average wholesale prices, usual and customary prices, and "maximum reimbursement amounts," subject to numerous exceptions and exclusions. It is not at all clear how this formula demonstrates that Rite Aid's reported usual and customary prices have no impact on Monmouth's payment obligation under the contract, and, again, Rite Aid provides no explanation.

Based on these provisions, Rite Aid contends that the contracts demonstrate that Monmouth would only make payments to Express Scripts and not to Rite Aid. (Rite Aid's Brief at 3.) To support this assertion, Rite Aid cites generally to the contracts in Exhibits D and E (both in excess of 30 pages), without identifying the specific pages that purportedly demonstrate a lack

6

of direct payments to Rite Aid.[2] More generally, Rite Aid contends that "plan sponsors such as Monmouth typically do not interact with . . . pharmacies," which Rite Aid bases on Monmouth's characterization of a pharmacy benefits manager as an "intermediary."

Relying principally on the Monmouth–Express Scripts contracts, Rite Aid now asks me to dismiss Monmouth's complaint.

## III. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Conclusory allegations do not suffice. Id. Twombly and Iqbal's plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. Plausibility requires "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a claim." Phillips v. Cty. Of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must (1) "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) identify the allegations that are not entitled to the assumption of truth because they are no more than conclusions; and (3) "where there are well-pleaded factual allegations, . . . assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Millberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011). Courts must construe the allegations in a complaint "in the light most favorable to the plaintiff." Id. at 220.

---

[2] Rite Aid also cites to footnote 13 of Monmouth's complaint, but footnote 13 also does not allege a lack of direct payments to Rite Aid.

When deciding a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

## IV. DISCUSSION

### A. Judicial Notice

I first conclude that I cannot take judicial notice of a factual inference that any insurance claim for which Monmouth seeks damages was submitted pursuant to the Monmouth–Express Scripts contracts. "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014). Other documents may be considered if they are "integral to or explicitly relied upon in the complaint." Id. (emphasis deleted). But even when documents outside the pleadings are properly considered on a motion to dismiss, they may only be used "to establish the truth of their existence, not the truth of their contents." Lupin Atlantis Holdings v. Ranbaxy Labs., Ltd., No. 10-cv-3897, 2011 WL 1540199, at *3 (E.D. Pa. Apr. 21, 2011); see also S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999). And a court must not use judicially noticed documents to "draw[] inferences against the non-moving party so as to dismiss its well-pleaded claims." See Victaulic Co. v. Tieman, 499 F.3d 227, 237 (3d Cir. 2007) (emphasis in original).

Given this clear precedent, I conclude that even if the Monmouth–Express Scripts contracts are properly before me, they may not be used to draw any of the factual inferences Rite Aid advocates in support of its motion to dismiss. By way of example, the Monmouth–Express Scripts contracts do not mention Rite Aid—yet Rite Aid asks me to infer that all transactions alleged in

8

Monmouth's complaint were subject to these contracts. Drawing such an inference would contravene the well-established rule that the non-moving party is entitled to "all reasonable inferences in [its] favor" on a motion to dismiss. Geness v. Admin. Off. of Pennsylvania Cts., 974 F.3d 263, 269 (3d Cir. 2020).

Rite Aid presses that it only seeks to use the Monmouth–Express Scripts contracts for their "legal effect," which it contends is different than using them for their truth. But "legal effect" is not a fair characterization of how Rite Aid suggests the Monmouth–Express Scripts contracts be considered. Rite Aid employs the contracts to create a narrative detailing how insurers, PBMs, and pharmacies interact and manage prices. Cf. Sturgeon v. Pharmerica Corp., 438 F. Supp. 3d 246, 259 (E.D. Pa. 2020) (refusing to rely on judicially-noticed government manuals "as substantive evidence that comprehensive regulations governing the pharmacy industry make pharmacy fraud categorically implausible"). It would be inappropriate to "foreclose all proof on . . . [this] central question by looking outside the record at the motion-to-dismiss stage." Id. In fact, many of the inferences Rite Aid advocates are not even contained in the contracts' terms, such as Rite Aid's primary contention that Monmouth had no direct interaction with Rite Aid.  And several of Rite Aid's contentions about the legal effect of the contracts—such as that Monmouth agreed to accept pharmacy-reported prices as "usual and customary"—are not readily apparent on the face of the documents and would likely be the subject of factual dispute.

Finally, judicial notice should be used "sparingly at the pleadings stage" and "[o]nly in the clearest of cases." Victaulic, 499 F.3d at 236. The Monmouth–Express Scripts contracts and the significance of the inferences Rite Aid seeks to draw from them are complex and, at the pleadings stage, anything but clear.  Rite Aid may have other procedural tools to challenge the truth of Monmouth's allegations, but judicial notice is not an appropriate one.

For these reasons, whether any transaction alleged in Monmouth's complaint was subject to the Monmouth–Express Scripts contracts is a fact not susceptible to judicial notice at the pleadings stage. Accordingly, I will consider the remainder of Rite Aid's arguments for dismissal without reference to these contracts.

### B. Rite Aid's Substantive Arguments

#### (1) Falsity

Several of Monmouth's claims allege that Rite Aid made false statements, and, as such, Monmouth is obligated to make these allegations with "particularity." Fed. R. Civ. P. 9(b). Rite Aid contends that Monmouth's claims should be dismissed because Monmouth has not detailed the particular statements alleged to be false.

Monmouth alleges generally that Rite Aid made false statements every time it put its listed retail prices as the "usual and customary" prices in a standard form when submitting claims for reimbursement to Monmouth. (Amended Complaint ¶¶ 35-40.) Monmouth also includes a table of fifteen examples of such reimbursement claims, along with what Monmouth contends were the true and misleading price for the drug. (Id. ¶ 61.)

I conclude that these allegations are sufficient. The particularity standard affords plaintiffs a degree of "flexibility" in the means by which they "inject[] precision and some measure of substantiation into their allegations of fraud." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). Given that Monmouth is alleging thousands of transactions, a general description of the alleged false transactions combined with a few specific examples of dates and amounts is sufficiently particular.

Rite Aid further objects that Monmouth does not allege that Rite Aid made false state-

ments "to Monmouth," which it characterizes as "not surprising considering that Monmouth does not interact with Rite Aid in any way." (Rite Aid's Brief at 12 (emphasis deleted).) However, Monmouth's complaint contains numerous allegations that Rite Aid reported usual and customary prices to Monmouth. (E.g., Amended Complaint ¶¶ 38, 78, 106, 125, 135, 309.) Rite Aid characterizes these allegations as "false[]," (Rite Aid's Reply at 4 n.4,) but their truth or falsity is not for resolution on a motion to dismiss. See Conard v. Pennsylvania State Police, 902 F.3d 178, 184 (3d Cir. 2018).

Rite Aid further contends that Monmouth has not adequately explained why it was false to report list prices as "usual and customary" prices. But Monmouth has alleged that the "usual and customary" price field in the standard form Rite Aid used to submit insurance claims was widely understood to mean the price that a cash-paying customer would be charged. (Amended Complaint ¶¶ 39-47.) The truth of that allegation is a factual matter.

### (2) Reliance

Rite Aid next argues that Monmouth has not plausibly alleged that it relied on Rite Aid's representations about usual and customary prices—that is, that Monmouth would have acted differently had it known the drugs' true prices.

Monmouth alleges that, had it known Rite Aid's reported prices were not the true usual and customary prices for the drugs, it "would not have proceeded with the transactions." (Amended Complaint ¶ 124.) Although this allegation does not provide a great deal of specificity, it is plausible, at this early stage of the proceedings, that an insurer in Monmouth's position would have refused to pay a claim had it known the information submitted was false.

11

### (3)  Monmouth's Status as a "Person" Under Pennsylvania's UTPCPL

Monmouth asserts a claim for Rite Aid's alleged violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 Pa. Stat., ch. 201.  The UTPCPL permits "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes" to "bring a private action" for damages related to an unlawful trade practice. 73 Pa. Stat. § 201-9.2(a). Rite Aid argues that Monmouth, as a political subdivision of New Jersey, is not a "person."

The UTPCPL defines "person" broadly to include, among other things, "any … legal entit[y]," a category that obviously includes Monmouth.  § 201-2(2).  But in Meyer v. Community College of Beaver County, 578, 93 A.3d 806 (Pa. 2014), the Pennsylvania Supreme Court held that a public community college could not be sued under the UTPCPL because a public entity is not a "person" under the UTPCPL's definition. Id. at 815.  Technically, Meyer only addressed the class of persons that can be sued rather than the class that can sue.  But Rite Aid argues that because the UTPCPL uses a common definition for the two classes, public entities must be excluded from both.

Following Meyer, the Pennsylvania Supreme Court held in Commonwealth ex rel. Shapiro v. Golden Gate Nat'l Senior Care LLC, 194 A.3d 1010 (2018), that the Commonwealth of Pennsylvania is a "person in interest" entitled to seek restitution under UTPCPL § 201-4.1.  194 A.3d at 1034.  Golden Gate distinguished Meyer in two ways: First, the term at issue was "person in interest" from UTPCPL § 201-4.1, whereas Meyer dealt with just "person" from § 201-9.2(a). The Court reasoned that "person in interest," which is not defined in the statute, must be analyzed "as a whole" and could therefore have a different meaning than "person." Id. at 1034.  Second, Golden Gate noted that Meyer was "driven in large part by the College's status as a defendant in

12

the lawsuit," thus implicating doctrines of "sovereign immunity" that have "no application" when the public entity is the plaintiff. Id. 1033. The Court in Golden Gate also characterized Meyer's holding in that regard as "narrow." Id.

In resolving this question of state law, the obligation of a federal court is to "predict how Pennsylvania's highest court would decide this case." Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 45-46 (3d Cir. 2009). I am persuaded by Golden Gate's statement that Meyer's holding was "narrow" and rested substantially on concerns of "sovereign immunity." 194 A.3d at 1033. With those concerns gone, there is no other reason why the exceedingly broad term "any other legal entit[y]" would not include a county like Monmouth. And although it is potentially unusual to give "person" two different meanings in UTPCPL § 201-9.2(a), it is not more unusual than giving "person in interest" a broader meaning than just "person." See Golden Gate, 194 A.3d at 1034. I will therefore deny Rite Aid's motion as to this ground.

### (4) Gist of the Action Doctrine

Rite Aid next argues that Monmouth's tort claims should be dismissed under Pennsylvania's "gist of the action doctrine" because the duties involved are contractual. "Under Pennsylvania law, the gist of the action doctrine prevents a purely contractual duty from serving as the basis for a tort claim." SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 216 (3d Cir. 2022). Whether a tort claim is barred under the gist of the action doctrine turns on "the nature of the duty alleged to have been breached." Id. at 217. "Tort actions arise from the breach of a duty owed to another as a matter of social policy, while breach-of-contract actions arise from the breach of a duty created by contract." Id. at 216.

Rite Aid contends that the gist of the action doctrine bars Monmouth's claims because Rite

13

Aid's duty to report usual and customary prices was created by contract. It is unclear whether Rite Aid is referring to the Monmouth–Express Scripts contracts, as Rite Aid was not a party to these contracts and thus also unclear how such contracts could impose duties on Rite Aid. In any event, I have concluded that I may not consider the factual inference that the Monmouth–Express Scripts contracts applied to the transactions underlying Monmouth's claims. For that reason, Monmouth's claims will not be dismissed under the gist of the action doctrine.

### (5) Economic Loss Doctrine

Rite Aid argues that Monmouth's fraud and negligent misrepresentation claims are barred by Pennsylvania's "economic loss" doctrine, which bars some—but not all—tort claims for purely economic loss. See Dittman v. UPMC, 196 A.3d 1036, 1054 (Pa. 2018). For example, Dittman itself allowed tort claims for economic loss to proceed. See id. Thus, the mere fact that Monmouth's claims seek damages for economic loss does not mean they are barred by the economic loss doctrine. Instead, Rite Aid must explain why Monmouth's claims belong to the category of barred economic loss claims as opposed to the category of permissible economic loss claims.

The only explanation Rite Aid gives is to repeat its contention that any duty to report prices was governed by contract. As before, I have determined that I cannot consider the impact of the alleged contracts at this stage of the litigation. I will therefore deny Rite Aid's motion as to this ground.

### (6) Unjust Enrichment

Rite Aid argues that Monmouth's unjust enrichment claim should be dismissed for two reasons. The first is Rite Aid's assertion that an express contract governed the relationship between Monmouth and Rite Aid, which, as stated above, I cannot consider at this stage. The second is Rite

14

Aid's additional assertion that Monmouth paid nothing to Rite Aid directly. Because Monmouth's complaint alleges that "Rite Aid . . . charged [Plaintiffs]" (thus including Monmouth) for the drugs at issue, and because I must accept this allegation as true, I will deny Rite Aid's motion to dismiss Monmouth's unjust enrichment claims.

### (7) Statute of Limitations

Monmouth acknowledges that some of the conduct alleged in its complaint occurred outside the statutes of limitations applicable to its various claims, but argues that the statutes are tolled because Rite Aid engaged in an "affirmative and independent act of concealment" to "prevent [Monmouth] from discovering the injury despite the exercise of reasonable diligence." Bohus v. Beloff, 950 F.2d 919, 926 (3d Cir. 1991). According to Monmouth, that "act of concealment" was submitting the same allegedly false pricing information that underlies Monmouth's fraud and misrepresentation claims.

Rite Aid does not dispute that submitting false pricing information is the type of "concealment" that could toll a statute of limitations. Instead, Rite Aid's sole argument is that it did not actually submit false pricing information. For the reasons discussed previously, factual disputes preclude resolution of Rite Aid's arguments at this time.

### (8) Injunctive Relief

Finally, Rite Aid argues that Monmouth's count for "injunctive relief" should be dismissed for the sole reason that injunctive relief is not a standalone cause of action. Rite Aid does not contend that injunctive relief is unavailable as a remedy should Monmouth succeed on its other claims. Instead, Rite Aid's sole objection is to the way Monmouth has drafted its complaint—putting injunctive relief in its own count. (See Rite Aid's Brief at 24 ("[A] separate claim for injunctive

relief is <u>unnecessary</u>." (emphasis added), citing <u>Chruby v. Kowaleski</u>, 534 F. App'x 156, 160 (3d Cir. 2013)).)

I conclude that no useful purpose would be served by restructuring Monmouth's complaint at this time. Before Monmouth could be granted injunctive relief, Monmouth must "prove [a] clear entitlement" to it under some theory. <u>Hope v. Warden, York County Prison</u>, 972 F.3d 310, 321 (3d Cir. 2020). Whether the allegations supporting injunctive relief are set out in a separate count of the complaint or repeated for each substantive count is immaterial. <u>See</u> <u>Johnson v. City of Shelby, Miss.</u>, 574 U.S. 10, 11 (2014) (per curiam) ("Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." (citation omitted)). I will therefore deny Rite Aid's motion as to this ground.

## V. CONCLUSION

For the reasons set out above, Rite Aid's motion to dismiss will be denied.

An appropriate order follows.